In the

# United States Court of Appeals
## For the Seventh Circuit
―――――――

Nos. 07-3688, 07-3832

MOHAMMAD AZAM HUSSAIN,

*Petitioner*,

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent*.

―――――――

Petition to Review an Order of the
Board of Immigration Appeals.
No. A70-921-157.

―――――――

ARGUED FEBRUARY 13, 2008—DECIDED MARCH 6, 2008

―――――――

Before CUDAHY, POSNER, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.  Mohammad Azam Hussain has petitioned us to review an order that he be removed from the United States. We recently decided a related case, in which he had sought habeas corpus relief against his detention pending the completion of the removal proceedings, 510 F.3d 739 (7th Cir. 2007), and our opinion in that case provides additional background concerning the government's protracted efforts to remove Hussain.

He had come to this country from Pakistan, his native land, in 1994, and five years later had become a lawful

permanent resident. But in September 2004 he was arrested and charged with having committed immigration fraud by means of false documents that had enabled him to enter and remain in the United States; other misrepresentations were charged as well. He was convicted in June 2005 and sentenced to nine months in prison, time served. The following month he was placed in detention in an immigration facility and removal proceedings were begun. His removal hearing was spread over several days between December 2005 and May 2006, when the immigration judge took the matter under advisement. He meanwhile had appealed his criminal conviction to us, for although he had served his sentence, a reversal of the conviction would help him resist removal. In October 2006, while the appeal was pending, the government agreed to vacate the judgment and dismiss the indictment in lieu of turning over classified *Brady* material to the defense.

In May of last year the immigration judge ordered Hussain removed. The judge ruled that Hussain had gained entry to the United States by fraud and was barred from seeking asylum (for which he had applied during the removal proceeding) by having been a member of a terrorist organization, namely the Mohajir Qaumi Movement-Haqiqi (MQM-H). Mohajirs are Muslim refugees from India who have settled in Pakistan. See Yaroslav Trofimov, "Pakistan's Embattled Leader Embraces Maverick Partner," *Wall St. J.*, Dec. 5, 2007, p. A1. The "embattled leader" referred to in this article is of course President Musharraf—himself a Mohajir—and the "maverick partner" is MQM—the Mohajir Qaumi Movement, though probably not the branch to which Hussain belonged, MQM-H.

But while finding that Hussain was removable, the immigration judge also found that he was entitled to relief under the Convention Against Torture because if returned to Pakistan he would be likely to be tortured. Thus the removal order was contingent. In October the Board affirmed the order and remanded the case for the entry of a final order of removal after completion of the background investigation that is required as a condition of release when a removable alien is allowed to remain in this country by reason of the Convention Against Torture or the refusal of any country to accept him. 8 C.F.R. § 1003.47. The immigration judge entered the final order on November 6, ordering Hussain removed but staying removal until and unless he could be removed without his removal's precipitating a violation of the Convention Against Torture. It is that order, which is administratively final, that Hussain now asks us to vacate. The government appealed the immigration judge's ruling that Hussain was entitled to deferral of removal by virtue of the Convention Against Torture to the Board of Immigration Appeals; the Board has now affirmed the ruling.

An alien is removable if he obtained entry into the United States by fraud. 8 U.S.C. § 1182(a)(6)(C)(i). Hussain obtained entry by showing immigration officers, upon his arrival in the United States, two documents that he had bought from a Pakistani official, one purporting to parole him into the United States on the basis of a pending application for asylum, the other purporting to authorize him to work in the United States. Both were spurious. Later, in a petition for naturalization, he omitted his membership in MQM, and in two loan applications he falsely represented himself to be a U.S. citizen. He testified in his removal proceeding that these were innocent mis-

takes, but the immigration judge was not required to believe him. For example, Hussain testified that he knew no English when he came to the United States, but his wife testified that when she first met him, two months after his arrival, they spoke only in English because she didn't know Urdu. Hussain's lawyer appears not to understand the limitations of judicial review of administrative decisions. He says that a federal agent's "imprecise recollection of these hearsay documents is not particularly probative." Perhaps not; but that is not the standard. The evidence was conflicting, and the immigration judge was entitled to credit the government's evidence.

The immigration judge and the Board also ruled that Hussain is removable by reason of having "engaged in a terrorist activity." 8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I). Since we have just held that he is removable because of having entered the United States through fraud, it might seem superfluous for us to discuss the alternative ground. It is not. Even after being ordered removed, an alien can pursue remedies that may enable him to stay. One is an appeal to the Convention Against Torture, and Hussain as we know has successfully appealed to it, and that might seem to make an invocation of other post-removal remedies academic even if the finding of removability on grounds of fraud does not. Again, not so. The Convention Against Torture provides less secure protection against removal than other remedies that Hussain might want to invoke, and not only because a change in country conditions that lifted the threat of torture would allow him to be removed. 8 C.F.R. § 1208.17(b)(iv). The government wants to try to obtain what we assume would be reliable diplomatic

assurances from the government of Pakistan that Hussain will not be tortured if he is returned there. If that attempt succeeds, he will be returned, § 208.17(f), and if it fails the government intends to explore the possibility that India, or some other country in which Hussain would not be in danger of being tortured, will accept him; and if this happens, he will be sent to that country. §§ 208.17(b)(2), 208.18(c). In contrast, if he can obtain cancellation of the order of removal, or asylum, or a fraud waiver, then he probably can remain in the United States permanently. 8 U.S.C. § 1229b(b)(1) (cancellation of removal); §§ 1158, 1159(b) (asylum); §§ 1255(a), 1227(a)(1)(H) (fraud waiver); 8 C.F.R. § 245.1(a) (same).

But two of these remedies are barred (though, in a few instances, with narrow exceptions, e.g., 8 U.S.C. § 1158(b)(2)(A)(v)) to an alien found to have engaged in terrorist activity: see 8 U.S.C. § 1229b(c)(4) (cancellation of removal), § 1158(b)(2)(A)(v) (asylum). The fraud waiver, in contrast, is not inapplicable to terrorists, but that cannot help someone found to have been a terrorist, since that is an independent basis for removal to which a fraud waiver is irrelevant.

Although Hussain was found removable for engaging in terrorist activity, it was not a ground stated in the charge that initiated the removal proceeding against him, and so, he argues, it cannot be the basis for barring him from seeking cancellation of removal. But all that the statutory bar requires is that the alien *be* removable on grounds of terrorism. 8 U.S.C. § 1229b(c)(4). That makes sense because one purpose of the terrorism statute is to bar forms of post-removal relief to aliens who have been ordered removed on a lesser ground, such as fraudulent entry. As held in such cases as *Salviejo-Fernandez v. Gonza-*

*les*, 455 F.3d 1063, 1065-66 (9th Cir. 2006), and *Brown v. Ashcroft*, 360 F.3d 346, 352-53 (2d Cir. 2004), that purpose does not require that involvement in terrorism be the stated ground of removal.

Since the finding that Hussain engaged in terrorist activity has consequences for him, we must soldier on and consider his challenge to that alternative ground of removability. He argues that the provision for removability on grounds of terrorism, 8 U.S.C. § 1182(a)(3)(B), is ambiguous and unless interpreted narrowly would precipitate a serious constitutional issue of fair notice, as in such cases as *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137-38 (9th Cir. 2000), and *Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1133-35 (9th Cir. 2007), though none of those cases involves that provision. The provision defines a terrorist organization as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in," certain designated activities, 8 U.S.C. § 1182(a)(3)(B)(vi)(III), including an illegal use of explosives, firearms, or other dangerous devices "with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." § 1182(a)(3)(B)(iii)(V)(b). A person who recruits or solicits funds for a terrorist organization so defined—or indeed "commit[s] an act that the actor knows, or reasonably should know, affords material support [to a terrorist organization], including . . . funds . . . or other material financial benefit"— "is deemed to have engaged in terrorist activity," unless he "can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." §§ 1182(a)(3)(B)(iv)(IV)(cc), (V)(cc), (VI)(dd).

These definitions are broad, but they are not vague. *McAllister v. Attorney General of the United States*, 444 F.3d 178, 186-87 (3d Cir. 2006); *United States v. Hammoud*, 381 F.3d 316, 330-31 (4th Cir. 2004), remanded on other grounds, 543 U.S. 1097 (2005). Hussain complains that they stretch the term "terrorist." They do. Terrorism as used in common speech refers to the use of violence for political ends. But the statutory definition of "terrorist organization" is broad enough to encompass a pair of kidnappers. See 8 U.S.C. § 1182(a)(3)(B)(iii)(II). Someone who sold the kidnappers a gun and rope, unless he could prove he had no reason to know they were kidnappers, would be "engaged in terrorist activity."

The statutory deformation of the ordinary meaning of "terrorist" would be a problem if people were allowed to rely, in determining their legal obligations, on the name of a statute without bothering to read the body of the statute. They are not. E.g., *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 527-29 (1947); *United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998); *United States ex. rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 866 (2d Cir. 1997). So it is irrelevant that MQM-H seems not to have a political agenda, but rather to be engaged in a kind of jurisdictional dispute with MQM-A over which group shall represent Pakistan's Mohajirs. It is likewise irrelevant that MQM-H does not appear to harbor any hostile designs against the United States; the statute does not require that the terrorist organization be a threat to us.

The statute may go too far, but that is not the business of the courts. Yet an ambiguity may seem to lurk in the definition of a terrorist organization as an organization that "engages in" a specified activity. What if an organiza-

tion contained people who resorted to violence without the organization's sanction; would the organization be "engaged in" that violence? That is a question about authorization. If an activity is not authorized, ratified, or otherwise approved or condoned by the organization, then the organization is not the actor. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 930-32 (1982). It may be liable under the principles of agency law, even criminally liable, for a harm done by one of its employees or other agents, as when an employee commits a tort within the course of his employment although not authorized to do so by his employer. E.g., *United States v. Potter*, 463 F.3d 9, 25-26 (1st Cir. 2006); *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 637 (7th Cir. 1987); *Restatement (Second) of Agency* § 212 (1958). But that does not mean that the employer "engaged in" the employee's act. An organization is not a terrorist organization just because one of its members commits an act of armed violence without direct or indirect authorization, even if his objective was to advance the organization's goals, though the organization might be held liable to the victim of his violent act.

Hussain recruited for MQM-H and solicited funds for it as well; the questions are whether the organization is a terrorist organization and if so whether Hussain has proved by clear and convincing evidence that he was unaware of the violent acts in which it engaged in its struggle with MQM-A. He argues futilely that nothing he did contributed to those acts; MQM-H engaged in nonviolent as well as violent activities and his work was only with the former. That is irrelevant. If you provide material support to a terrorist organization, you are engaged in terrorist activity even if your support is con-

fined to the nonterrorist activities of the organization. Organizations that the statute, and indeed in this instance common parlance, describes as terrorist organizations, such as Hamas in Gaza and Hezbollah in Lebanon, often operate on two tracks: a violent one and a peaceful one (electioneering, charity, provision of social services). If you give money (or raise money to be given) for the teaching of arithmetic to children in an elementary school run by Hamas, you are providing material support to a terrorist organization even though you are not providing direct support to any terrorist acts. *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 299-300 (3d Cir. 2004); *Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1134, 1137 (C.D. Cal 2005). As the Board of Immigration Appeals pointed out in *In re S-K-*, 23 I.&N. Dec. 936, 944 (BIA 2006), "Especially where assistance as fungible as money is concerned, [requiring] such a link would not be in keeping with the purpose of the material support provision, as it would enable a terrorist organization to solicit funds for an ostensibly benign purpose, and then transfer other equivalent funds in its possession to promote its terrorist activities."

Hussain was active in MQM-H between 1991 and 1996, two years after he came to the United States. In Pakistan he was a high-level official of the organization, in charge of a region in which there were 100,000 Mohajirs, of whom 2,000 belonged to his organization and thus were under his command. During that period members of the organization committed a number of acts of armed violence against members of the rival MQM-A, and MQM-H did not criticize, or make efforts to curb, that violence; an inference that it was authorized is inescapable. "Violence between the two rival factions [MQM-H and MQM-A] is

one of the main reasons Pakistani security forces have been called upon to restore law and order in Karachi numerous times since 1992. Members of both organizations are often involved in fights over territory within Karachi. Other MQM-H targets include other ethnic militants and government forces. For the most part, MQM-H actions are limited to small, but frequent, armed attacks or arsons. Often these attacks are committed to avenge the death of MQM-H members at the hands of rival factions such as MQM-A." Memorial Institute for the Prevention of Terrorism, "MIPT Terrorism Knowledge Base," www.tkb.org/Home.jsp (visited Feb. 14, 2008); see also "Rangers Arrest Three MQM-H Activists," *Daily Times*, p. 1 (Aug. 5, 2004), www.dailytimes.com.pk/default.asp?page=story_5-8-2004_pg1_3 (visited Feb. 19, 2008); Minorities at Risk Project, University of Maryland, "Assessment for Mohajirs in Pakistan" (2004), www.cidcm.umd.edu/mar/assessment.asp?groupId=77007 (visited Feb. 19, 2008); Mike Tolson, "Reaping the Whirl-wind: Karachi's Descent into Hell," *Houston Chronicle*, Nov. 8, 1998, p. 2. The fact that the violence was not formally authorized and had no clear political aim is irrelevant. And the acts of violence (including almost daily killings in 1993 and 1994, while Hussain was still an MQM-H official in Pakistan) were so frequent that Hussain could not have failed to learn about them—indeed, he admitted he knew about them— and to learn that they had not been denounced by the organization's leadership, of which he was a part.

Hussain makes a couple of procedural objections to the removal proceeding, but they have no merit and we will not burden this opinion with a discussion of them. The Board's conclusion that Hussain is removable both for fraud and for material support of terrorism must be

sustained. But we note that Hussain has been in custody for more than two and a half years and that since he cannot at present be removed from the United States because of the Board's ruling on the Convention Against Torture, the six-month presumptive limitation on detaining an alien if he has been ordered removed but the order cannot be executed without violating the Convention now begins to run. *Zadvydas v. Davis*, 533 U.S. 678 (2001); *Hussain v. Mukasey*, *supra*, 510 F.3d at 742-43.

The petition for review is

DENIED.